# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE v. NEWT CARTER

### Direct Appeal from the Circuit Court for Madison County
### No. 07-498    Roy B. Morgan, Jr., Judge

### No. W2009-00600-CCA-R3-CD  - Filed June 11, 2010

A Madison County jury convicted the defendant, Newt Carter, of aggravated rape, a Class A felony, and aggravated burglary, a Class C felony. The trial court sentenced the defendant as a Range I standard offender to twenty years at 100% for aggravated rape consecutive to five years at 30% for aggravated burglary, to be served in the Tennessee Department of Correction. On appeal, the defendant contends that (1) the evidence was insufficient to support his convictions; and (2) the trial court erred in sentencing the defendant by misapplying enhancement factors and ordering the defendant to serve the sentences consecutively. Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Joseph T. Howell (on appeal), and Angela J. Hopson and Ramsdale O'Deneal (at trial), Jackson, Tennessee, for the appellant, Newt Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Jerry Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

In September 2007, a Madison County grand jury indicted the defendant, Newt Carter, for aggravated rape, a Class A felony, and aggravated burglary, a Class C felony. The

Madison County Circuit Court, the Honorable Roy B. Morgan, Jr., presiding, held a jury trial on May 13, 2008. The parties presented the following evidence at trial.

*State's Proof*

The victim testified that she was fifty years old at the time of trial. On July 1, 2006, the victim lived in the Lincoln Courts apartment complex in Jackson, Tennessee. During the preceding evening, she spent time with her daughter, her daughter's children, and her daughter's boyfriend, the defendant, at her daughter's apartment, which was across the street from her own. They drank alcohol and talked until 2:00 a.m. During that evening, the defendant mentioned that rapists entered homes through windows and forced their victims to wash themselves after the rape. When the victim decided to go home, the defendant accompanied her across the street. They entered her apartment together, and he waited while she checked her windows to ensure that they were locked. Then, he left, saying that he would return to check on her. She locked the door and went to her bedroom to watch a movie. At approximately 3:30 a.m., the defendant knocked on her bedroom door, which was partially open. He asked if she was okay, and she replied, "Yes, I'm fine. . . . You don't have to come back anymore." The victim testified that she was concerned at that point because the defendant was smiling and because she had previously told him that she would be fine.

At 5:00 a.m., the victim awoke to a man tapping her temple with a gun. The man wore a stocking cap over his face and was otherwise naked. He whispered to her to "drop 'em." When she hesitated to remove her clothes, he told her to "[h]urry up." She did not recognize his voice, and she could not tell what race the man was. She removed her clothes, and the man instructed her to lie down on the bed. He fondled her breast and moved his hand between her legs. Then, he told her to "suck it." She performed oral sex on him until he told her to get on her knees on the bed. The victim testified that he penetrated her vagina with his penis. She was unable to tell whether he wore a condom. After approximately five minutes, he stopped and laid down, ordering her to get on top of him. He penetrated her again. The victim said that after he was finished, he ordered her to clean up. Throughout the rape, he pointed the gun at her head. She went into her bathroom and washed her vaginal area. The victim testified that she was able to see at that point that the man was dark-skinned and five feet, ten inches, tall. He told her to "[g]et on up in there[,]" and she complied by washing the interior of her vaginal area with a washcloth. While she washed, the man ran downstairs and out the back door. She waited before she went downstairs and locked the door.

After she locked the door, she returned upstairs and began calling her daughter. She heard a noise at her window and shut off her phone before completing the call. The victim said that she took a bat out of her bedroom closet and stood in her room until she gathered the courage to call her daughter. When she called, her daughter answered the phone, but the

defendant "grabbed the phone." She told him what happened to her. He arrived at her apartment, letting himself in with a key. The victim said that she was unsure what time the police arrived because she was hysterical. The police took her to the emergency room, where hospital personnel examined her utilizing a rape kit, which involved taking her blood and examining her genital area. The victim testified that she had known the defendant for six years. She had never had a sexual relationship with him.

On cross-examination, the victim testified that her daughter, the defendant, and their children lived with her for a time prior to 2006. She said that she wears glasses and cannot see well without them. The victim agreed that she told the investigator that she had her glasses on during the rape. The victim said that her assailant had on black army shoes and a beige stocking cap. She said that she could not tell what race the man was because she averted her eyes from him as much as possible. She did not see any identifying features on the man and said that she closed her eyes while she was on top of him. The victim testified that the assailant had the gun wrapped in a towel, but she felt the cold barrel. The victim said that she might have told a different version of what happened to the police because she was hysterical. She described the defendant as having a slim build and dark skin. The victim testified that she brushed her teeth after her assailant left, before anyone else arrived at her apartment. She said that, as far as she knew, the defendant did not often let himself into her apartment. The victim agreed that she never told the defendant that he could not come into her house or ask him to give her the key he used. The victim testified that she drank one beer at her daughter's apartment, and the defendant walked her home because of the number of men standing outside the apartments. She agreed that, on the day of the rape, she did not identify the defendant as a suspect. When she began to suspect him, she did not tell investigators but did tell her daughter.

On redirect examination, the victim testified that she began to suspect the defendant "because he was acting funny, and he said, 'They can't get me. . . . They can't get me for that.'"

Jackson Police Officer Karrie Hart testified that she responded to a burglary and rape call at the victim's residence on July 1, 2006. The defendant met her at the front door when she arrived and told her the victim was upstairs. As Officer Hart walked up the stairs, she heard the victim "screaming and crying." When Officer Hart entered the victim's bedroom, she saw the victim on her hands and knees, dressed in a bra and sweatpants. She urged the victim to finish dressing. Officer Hart said the victim was "extremely upset." The victim found a shirt and began putting it on when the defendant entered the room. "[H]e started pulling her arm, and [Officer Hart] told him to wait a minute." The defendant gave the officer "an agitated look." The victim finished dressing and began telling the officer what happened. The defendant interjected, saying that everything was locked except for a

window. Officer Hart instructed the victim to continue, and the victim began her story again but began crying. The officer asked the defendant to leave the room, which he did, "but he didn't appear to be happy about it."

The victim told Officer Hart that a man came into her room and whispered to her to take off her clothes. He penetrated her from behind. The victim told Officer Hart that the man wore a stocking cap and boots. After the rape, he told her to wash. The victim said that she used tissues to wipe herself, which were in the bathroom trash can. Officer Hart collected the tissues as evidence. The victim also spit into several tissues, which another officer collected. Officer Hart took the victim to Jackson-Madison County General Hospital's emergency room for an examination with a rape kit. On the way, the victim also told Officer Hart that she had spent the evening with her daughter and the defendant, and the defendant had warned her about a rapist that entered through windows and forced women to wash after the rape. Officer Hart testified that, based on her experience and common sense, she considered the defendant's behavior to be suspicious.

On cross-examination, Officer Hart testified that the victim told Investigator Danielle Jones the same thing that the victim told her, except that the victim did not tell Officer Hart that the man penetrated her while she was on top of him. The victim also told her that the man was putting on clothes while she was washing.

Jackson Police Officer Marvent Brooks, a crime scene technician, testified that he photographed and collected evidence from the victim's apartment. He collected her clothing; tissues into which she had spat; the face towel with which she had washed herself; the bedsheets; the victim's toothbrush; and swabs from the apartment's back door, bathroom door, and bathroom floor. Officer Brooks identified pictures showing that the window in the victim's bathroom was open, but the screen was intact. He testified that there were no indications of forced entry into the apartment. Officer Brooks said that the defendant was "excessively helpful" when he arrived at the scene.

Dr. Jim Craig, an emergency room physician at Jackson-Madison County General Hospital, testified that he collected samples from the victim on July 1, 2006, for a sexual assault kit. The samples included oral, anal, and vaginal swabs, as well as a blood sample. Dr. Craig testified that the victim was uninjured but said that individuals "can be assaulted with no injury."

Lisa Mitchell, a registered nurse employed at Jackson-Madison County General Hospital, testified that she was a sexual assault nurse examiner. Ms. Mitchell treated the victim in the emergency room on July 1, 2006. She observed that the victim was "very calm and very cooperative." Ms. Mitchell documented the victim's version of events as part of

-4-

her medical history. The victim told her that a man, whose head was covered with hosiery, held a gun to her head and penetrated her vagina with his penis while she was on her back, on her knees, and on top of him. The victim also told her that she performed oral sex on him, and he made her wash her genitals.

On cross-examination, Ms. Mitchell testified that the victim did not know the man's race. The victim said that the man was a stranger.

Jackson Police Investigator Danielle Jones testified that she first met the victim at the hospital on July 1, 2006. Later on the same day, she spoke with the defendant. She considered him to be a possible witness because he was the last person to have contact with the victim, he was the first person on the scene after the rape, and the responding officers considered his behavior to be suspicious. Investigator Jones obtained a DNA sample from the defendant by swabbing the inside of his cheeks. She sent the victim's sexual assault kit and the defendant's oral swabs to the Tennessee Bureau of Investigation ("TBI") laboratory in Nashville for comparison. She said the victim gave her a "supplemental description" that her assailant was dark-skinned and five feet, ten inches tall.

On cross-examination, Investigator Jones testified that the victim told her that the assailant forced her to perform fellatio on him and penetrated her while she was on her back, from behind while she was on her knees, and while she was on top of him.

Agent Michael Turbeville, of the TBI, testified that he received evidence from the Jackson Police Department in regards to this case, including the victim's sexual assault kit, the evidence collected from her apartment, and the defendant's oral swabs. He sent the items to Bode Technology in Lorton, Virginia, for testing due to a backlog in cases at the TBI.

Frank Basile, a forensic scientist at Bode Technology, testified that he analyzed evidence received from the TBI in relation to this case. He confirmed the presence of semen on the victim's vaginal swabs, her panties, the face towel, and the bedsheets.

Sara Shields, a DNA analyst at Bode Technology, testified that she analyzed the evidence received from the TBI regarding this case. She used the victim's blood sample and the defendant's oral swabs to create DNA profiles for comparison to the evidence. Ms. Shields testified that the victim's vaginal swab, her panties, the towel, and the bedsheets contained two DNA profiles, that of the victim and that of the defendant. She testified that the possibility that any person was the source of the male DNA profile, other than the defendant, exceeded the current world population.

-5-

Jackson Police Officer Robert Faulkner testified that, on July 8, 2006, he collected evidence on the ground outside of the victim's apartment, including a window screen and an "apparatus associated with a window." The parties stipulated "that fingerprints were attempted to be lifted from those items . . . and none were found."

*Defense Proof*

Tiffany Hill, the victim's daughter, testified that she had four children with the defendant, and at the time of trial, they were no longer in a relationship. She said that on July 1, 2006, she, the defendant, and the victim were drinking and talking at Ms. Hill's apartment. The defendant said that he had heard about a woman being raped and the rapist telling her to brush her teeth and take a bath afterwards. At midnight, Ms. Hill asked the defendant to walk the victim home because the victim was "tipsy." She sent him to check on her at 2:00 a.m. A couple of hours later, her mother called her, and the defendant answered. The victim was crying and immediately hung up the phone. Ms. Hill asked the defendant to go check on the victim, and she gave him her keys. Then, she called the victim back. The victim told her that she had been raped and asked her to call the police. Ms. Hill testified that when the defendant answered the phone, "[h]e was just getting up to go use the bathroom." She assumed that he had been in bed prior to that but was unsure because she was asleep. She fell asleep lying on his chest, but she said that because she was drunk, she would not have known if he moved. Ms. Hill testified that she never discussed the details of the rape with the victim.

On cross-examination, Ms. Hill testified that the defendant went to Chattanooga, Tennessee, to avoid arrest after the authorities issued a warrant for him in this case.

On redirect examination, Ms. Hill agreed that she told the investigators that the defendant was with her at the time of the rape, but she said that once she fell asleep, she did not know where he was.

The defendant testified that he did not rape the victim nor did he enter her home without permission. He said that between 10:00 a.m. and 11:00 a.m., on June 30, 2006, he had consensual sex with the victim at her apartment. He did not use a condom, and afterwards, he washed with a towel in her bathroom. The defendant testified that he and the victim had been in an ongoing sexual relationship since he graduated from high school. On June 30, 2006, he told the victim that he wanted to end the relationship because he did not want Tiffany Hill to find out about their relationship. The victim promised that she would "never admit that [they] had sex." He spent the evening of June 30 at his and Ms. Hill's apartment, talking with Ms. Hill and the victim. He told them that, while he was incarcerated, he heard how a man raped one of their neighbors. The defendant walked the victim home at midnight. Between 2:00 a.m. and 2:30 a.m., Ms. Hill tried to call the victim,

but she did not answer her phone. Ms. Hill sent the defendant over to the victim's apartment to check on her. He entered the back door and went to her bedroom. She said that she was fine, so he left through the back door and returned home. The defendant testified that he fell asleep while he watched a movie with Ms. Hill.

Later, the victim called Ms. Hill's phone, and the defendant answered it. The victim was crying and hung up immediately. Ms. Hill gave the defendant her key to the victim's house and asked him to check on the victim. He went over to the victim's apartment while Ms. Hill called the victim. The defendant entered the victim's apartment and went upstairs. He testified that the victim was calmly brushing her teeth when he walked into her bedroom. The victim told him what happened and that Ms. Hill had called the police. He went downstairs to wait for the police and let them in as they arrived. The victim began crying and screaming when the police arrived. The defendant said that he watched as the police talked to the victim because he was curious. The defendant said that he did not own black army boots, and he said that the victim gave him permission to enter her apartment with Ms. Hill's key. He testified that he has tattoos on his arm and shoulder, and the victim knew that he had the tattoos. The defendant said that he cooperated with the police in their investigation by giving his consent for them to take his DNA and answering all of their questions.

On cross-examination, the defendant testified that he told people about his relationship with the victim, but he did not tell law enforcement. He told Ms. Hill about the relationship after he received the DNA report in which the analysts confirmed the presence of his semen on the evidence. The defendant said that he believed that someone raped the victim, but he was not responsible. The defendant admitted that he went to Chattanooga, Tennessee, after the grand jury indicted him. He admitted that he ran from police in Chattanooga and gave them a false name, resulting in a conviction for criminal impersonation.[1]

### State's Rebuttal Proof

Dr. Craig testified that semen could be present in a person's body eighteen hours after ejaculation. On cross-examination, he agreed that semen could be present in a person's body for up to seventy-two hours after ejaculation.

Following deliberations, the jury found the defendant guilty as charged of aggravated rape, a Class A felony, and aggravated burglary, a Class C felony.

### Sentencing

---

[1] The record reveals that the defendant also received a conviction for resisting arrest in connection with this incident.

The trial court held a sentencing hearing on July 7, 2008. The parties agreed that the defendant was a Range I standard offender. The trial court admitted the defendant's presentence report as evidence and heard testimony from the defendant, the defendant's pastor, and the defendant's mother. The defendant maintained that he was innocent of the offenses for which the jury convicted him. The defendant's pastor testified that he knew the defendant to be a "quiet person" and asked the court for leniency in sentencing because he believed the defendant could be rehabilitated. The pastor acknowledged that he was unaware of the defendant's prior convictions and drug use. The defendant's mother asked the court for leniency so that the defendant could raise his children.

The trial court found that no mitigating factors applied to the defendant's case. It further found that the following enhancement factors applied: (1) the defendant had a history of criminal convictions in addition to those necessary to establish the sentencing range; (2) the defendant failed to comply with conditions of a sentence involving release into the community; (3) the defendant was on probation when he committed the instant felonies. The court sentenced the defendant to twenty years at 100% for aggravated rape and to five years at 30% for aggravated burglary. The court ordered that the defendant serve the sentences consecutively to each other and to his sentence for a prior robbery conviction because he committed the instant offenses while on probation.

The defendant did not file a motion for new trial nor a notice of appeal. However, the trial court granted a delayed appeal on March 17, 2009. The defendant filed a notice of appeal on March 18, 2009.

**Analysis**

I. Sufficiency of the Evidence

On appeal, the defendant first challenges the sufficiency of the evidence to support his convictions for aggravated rape and aggravated burglary. He argues that (1) the state did not prove beyond a reasonable doubt that the defendant was armed with a gun during the rape, and (2) he had effective consent to enter the victim's apartment at any time. The state responds that (1) the jury accredited the victim's testimony that she felt a gun barrel pressed against her temple, and (2) the jury made a reasonable inference that the defendant did not have effective consent. We agree with the state.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State*

*v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

## A. Aggravated Rape

To sustain the defendant's conviction for aggravated rape, the state had to prove beyond a reasonable doubt that the defendant unlawfully, using force or coercion, sexually penetrated the victim and that "the defendant [was] armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" Tenn. Code Ann. § 39-13-502(a)(1).

Viewed in the light most favorable to the state, the evidence showed that the defendant entered the victim's house when she was asleep and awakened her by tapping her head with what the victim testified was a gun. While the object was wrapped in a towel, she felt a cold barrel against her head. The defendant ordered her to disrobe and to perform fellatio on him before he penetrated her vagina with his penis. Analysts found the defendant's semen in the victim, on her bedsheets, on her underwear, and on a towel in her bathroom. By finding the defendant guilty of aggravated rape, the jury accredited the victim's testimony that her assailant was "armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon[.]" *See id.* It is irrelevant that the victim was unable to describe the weapon or that the police did not find a weapon in the course of their investigation. The jury resolved the factual issue in favor of the state, and this court is not free to re-evaluate the question. *See Reid*, 91 S.W.3d at 277; *Bland*, 958 S.W.2d at 659. We conclude that a rational jury could find that the defendant was armed during the rape beyond a reasonable doubt; therefore, the defendant's argument is without merit.

## B. Aggravated Burglary

The Tennessee Code Annotated defines aggravated burglary, in relevant part, as entering a habitation without the effective consent of the owner and with the intent to commit a felony, theft, or assault. Tenn. Code Ann. §§ 39-14-402(a)(1), -403(a). A habitation is defined as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" *Id.* § 39-14-401(1)(A). Effective consent is defined as

> assent in fact, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when:
>
> (A) Induced by deception or coercion;
>
> (B) Given by a person the defendant knows is not authorized to act as an agent;
>
> (C) Given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or
>
> (D) Given solely to detect the commission of an offense[.]

*Id.* § 39-11-106(a)(9).

Viewed in the light most favorable to the state, the evidence showed that the defendant did not have his own key to the victim's house. When the defendant checked on the victim between 2:00 a.m. and 3:00 a.m., she told him that he did not need to come back. While the victim did not explicitly deny the defendant permission to enter her house, she did not give him permission to come and go as he pleased. The jury inferred from the victim's testimony that the defendant did not have effective consent. We do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See Elkins*, 102 S.W.3d at 582; *Reid*, 91 S.W.3d at 277. We conclude that a rational jury could have found, beyond a reasonable doubt, that the defendant entered the victim's apartment without her consent with the intent to rape her. Therefore, the defendant is without relief as to this issue.

II. Sentencing

For his second issue, the defendant argues that his sentence was excessive because the trial court erred by applying overlapping enhancement factors and by ordering the sentences to run consecutively. The state responds that the trial court did not abuse its discretion when sentencing the defendant.

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

A. Enhancement Factors

Prior to the 2005 amendments to the 1989 Sentencing Act, in sentencing a defendant, a court was to begin at the mid-point of the statutory range and then apply the appropriate enhancement and mitigating factors. Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. *See* Tenn. Code Ann. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id.* § 40-35-210(d).

The weight given to each enhancement or mitigating factor is in the discretion of the trial court, assuming that the trial court has complied with the purposes and principles of the sentencing act and its findings are supported by the record. *See Carter*, 254 S.W.3d at 345. The statutes prescribe no particular weight for an enhancement or mitigating factor. *State v. Gosnell*, 62 S.W.3d 740, 750 (Tenn. Crim. App. 2001). Under the 2005 amendments, the trial court's weighing of enhancement and mitigating factors is not a grounds for appeal. *Carter*, 254 S.W.3d at 344.

Aggravated rape is a Class A felony. Tenn. Code Ann. § 39-13-502(b). As a Range I offender, the defendant was eligible for a sentence of fifteen to twenty-five years. *Id.* § 40-35-112(a)(1). Aggravated burglary is a Class C felony. *Id.* § 39-14-403(b). As a Range I offender, the defendant was eligible for a sentence of three to six years. The trial court found that three enhancement factors applied: (1) the defendant's history of criminal convictions in addition to those necessary to establish the sentencing range; (2) the defendant's failure to comply with conditions of a sentencing involving release into the community and (3) the defendant was on probation when he committed the instant felonies. *See id.* § 40-35-114(1),(8),(13)(B).

The record supports the trial court's findings. The state listed eight prior convictions in its Notice to Seek Enhanced Punishment, each of which is documented in the defendant's presentence report, supporting the trial court's finding that the defendant had a history of criminal convictions in addition to those necessary to establish the sentencing range. The defendant committed five of his prior convictions while on probation for robbery, excluding the two convictions in the instant case, supporting the trial court's finding that the defendant failed to comply with conditions of a sentence involving release into the community. Finally, when he committed the instant offenses, the defendant was serving five years of probation for a robbery to which he pled guilty in 2005. The defendant argues that enhancement factors eight and thirteen overlap; however, the defendant fails to recognize that the offenses for which he was sentenced were not the only offenses he committed while on probation. Additionally, he presents no authority supporting his contention that the trial court was prohibited from applying both factors. Because the record supports the trial court's findings, we conclude that the trial court did not abuse its discretion in applying the enhancement factors.

### B. Consecutive Sentences

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of the following statutory criteria apply:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;
>
> (3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration

of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).


Specific findings that an extended sentence is necessary to protect society and is reasonably related to the severity of the offenses are prerequisites to consecutive sentencing under the "dangerous offender" category in Tennessee Code Annotated section 40-35-115(b)(4). *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). However, such specific factual findings are not required for the other categories of Tennessee Code Annotated section 40-35-115(b). *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). Nevertheless, the general principles of sentencing require that the length of the sentence be "justly deserved in relation to the seriousness of the offense" and "be no greater than that deserved for the offense committed." *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (citing Tenn. Code Ann. §§ 40-35-102(1) and -103(2)).


The trial court found that the defendant committed aggravated rape and aggravated burglary while on probation for robbery, which satisfies the statutory criteria for imposing consecutive sentences. Tenn. Code Ann. § 40-35-115(b). The defendant admits that the trial court properly considered this factor, but he contends that the trial court should not have imposed consecutive sentencing because the court did not find that the defendant was a professional criminal nor that his criminal activity was extensive. However, a trial court need only find the existence of one of the statutory criteria by a preponderance of the evidence in order to impose consecutive sentencing. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). We conclude that the trial court did not abuse its discretion by ordering the defendant to serve his sentences consecutively; therefore, the defendant is without relief as to this issue.


**Conclusion**


Based on the foregoing reasons, we affirm the judgments of the trial court.

-13-

_____

J.C. McLIN, JUDGE